IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARITIME PHARMACEUTICAL SERVICES, INC., | § § § § § § § § § § § | Case No. 4:23-cv-3551 |
| *Plaintiff*, | | |
| v. | | JURY TRIAL DEMANDED |
| STATE OF QATAR, | | |
| *Defendant*. | | |

**ORIGINAL COMPLAINT**

Plaintiff Maritime Pharmaceutical Services hereby files its original complaint against Defendant State of Qatar.

### INTRODUCTION

Maritime brings this lawsuit to recover at least $1.4 million in unpaid invoices for pharmaceuticals supplied on behalf of the State of Qatar. Beginning in 2012, Maritime supplied pharmaceuticals to certain individuals, including Qatari citizens and employees of the Consulate for Qatar in Houston through an arrangement with Qatar. For years, Maritime sent invoices for the pharmaceuticals to the Consulate for Qatar in Houston, Texas, and the Embassy for Qatar in Washington, D.C. paid Maritime after representatives at the Consulate for the medical attaché signed off on the invoices. But in 2019, new employees at the Embassy began delaying payment on certain invoices and partially paying others. Ultimately, Qatar either partially paid or refused to pay at least $1.4 million in invoices for pharmaceuticals supplied by Maritime to individuals on behalf of Qatar.

Maritime now asserts claims against Qatar for breach of contract, open account, fraudulent inducement, fraud, and quantum meruit, and seeks at least $1.4 million in damages, plus interest, exemplary damages, and attorneys' fees.

1

## PARTIES

1. Maritime Pharmaceutical Services, Inc. ("Maritime") is a Texas corporation with its principal place of business located at 900 Broadway Street, Houston, TX 77012.

2. Defendant State of Qatar ("Qatar") is a foreign state. Qatar maintains an embassy located at 255 M Street Northwest, Washington, District of Columbia 20037 ("Embassy") and a consulate located at 1990 Post Oak Boulevard, Houston, Texas 77056 ("Consulate").

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1330(a)—because this is a lawsuit against a foreign state as defined by 28 U.S.C. § 1603(a)—and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, ("FSIA")—because Qatar's conduct falls within the exceptions to foreign sovereign immunity in § 1605(a)(2) and § 1605(a)(5) of FSIA. Qatar committed multiple torts described herein in the United States, and entered into a commercial agreement with Maritime to purchase and pay for pharmaceuticals for certain individuals, including citizens of Qatar and/or employees of the Consulate.

4. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity among the parties.

5. This Court has personal jurisdiction over Qatar pursuant to 28 U.S.C. § 1330(b) because service has or will be made pursuant to 28 U.S.C. § 1608(a).

6. Venue is proper under 28 U.S.C. § 1391(f)(1) because all or a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Texas.

## FACTUAL BACKGROUND

7. Maritime is a provider of retail pharmaceutical products to patients in the greater Houston area. Frequently, Maritime provides pharmaceuticals to individuals from foreign countries who come to Houston to receive medical care. Maritime has a particular focus on supplying individuals from countries in the Middle East.

8. Maritime also provides a premium service, supplying pharmaceuticals with greater

speed than competitors and delivering those pharmaceuticals directly to patients. Maritime specifically hires and retains staff who speak and write in Arabic to assist patients from Arabic-speaking countries.

9. In 2012, Tekle Tesfaye, President of Maritime, was informed that Qatar was looking for a pharmacy that could supply pharmaceuticals to certain individuals, including Qatari citizens and employees of the Consulate, who would be receiving medical care in Houston.

10. Tesfaye subsequently met with Dr. Mohammed Mairgani—a representative at the Consulate for the medical attaché to the Embassy, Nasser Ali Al-Saadi—to discuss how Maritime could assist in providing pharmaceuticals to these individuals, and how Qatar was willing to pay for those pharmaceuticals on behalf of these individuals.

11. As a representative for the medical attaché, Mairgani was empowered to negotiate and make agreements on behalf of Qatar to pay for and supply pharmaceuticals to these individuals.

12. During their conversations, Mairgani proposed an arrangement whereby the individuals who were receiving medical care in Houston would fill their prescriptions through Maritime. Maritime would then supply the pharmaceuticals and send an invoice to the Consulate listing out the amount and price of those pharmaceuticals. The invoices would be signed by Mairgani or his staff, confirming Qatar's approval of the price and amount of pharmaceuticals supplied by Maritime. These signed invoices would then be sent back to Maritime, who would forward the invoices to the Embassy for payment. The Embassy would then pay Maritime.

13. Tesfaye agreed to this arrangement on behalf of Maritime, and relied on Mairgani's representations concerning the relationship between Maritime and Qatar.

14. For the remainder of 2012 and subsequent years, Maritime filled prescriptions for hundreds of individuals receiving medical care in the greater Houston area. Mairgani and his staff, which included Dr. Morad Etayeb and Dr. Maher Al Jerjawi, signed off on thousands of invoices for prescriptions on behalf of Qatar, and the Embassy paid Maritime for the pharmaceuticals. This arrangement went on for multiple years with little to no interruption.

15. Beginning in 2018, Maritime's signed invoices were handled by a new accountant in the Embassy, Ahmed Raafat Mohamed. Mohamed began to delay payment of the invoices and question some of the prices of the pharmaceuticals. Maritime also began to receive partial payment on some of the invoices. During this time, Maritime continued to provide invoices, receive approval from Mairgani, and send invoices to the Embassy for payment.

16. On November 7, 2019, Mohamed emailed Maritime and Tesfaye to inform them of "serious concerns, reservations and hesitation about moving forward with payment" on invoices totaling approximately $700,000. Mohamed made false allegations of price gouging and unfair practices and threatened to complain to governing and regulatory entities in Texas. The Embassy ultimately paid those invoices in May 2020.

17. Following Mohamed's email, however, other pending invoices were not paid, despite Maritime's continued, diligent requests for payment. In total, Maritime submitted at least $1.33 million in signed invoices to the Embassy that remain unpaid to this day. In addition, the Embassy partially paid multiple invoices such that Maritime is still owed approximately $70,000 on these invoices.

## CAUSES OF ACTION
### COUNT 1: Breach of Contract

18. The preceding paragraphs are incorporated by reference for this claim.

19. Maritime and Qatar had a valid and enforceable agreement for the payment of pharmaceuticals supplied by Maritime.

20. As a party to the agreement, Maritime is a proper party to bring suit for breach of contract.

21. Maritime performed its obligations under the agreement by supplying the pharmaceuticals to individuals on behalf of Qatar, submitting invoices listing the price and amount of pharmaceuticals to the Consulate, and submitting the signed invoices to the Embassy for payment. Alternatively, Maritime was excused from performing its obligations under the agreement once

Qatar materially breached the agreement.

22. Qatar breached the agreement by failing to provide full payment for the pharmaceuticals supplied by Maritime.

23. Maritime incurred damages of at least approximately $1.4 million because of Qatar's breach.

## COUNT 2: Open Account

24. The preceding paragraphs are incorporated by reference for this claim.

25. There was a series of transactions between Maritime and Qatar whereby Maritime sold pharmaceuticals to Qatar and delivered pharmaceuticals to individuals on behalf of Qatar, and Qatar paid for those pharmaceuticals.

26. This general course of dealing between Maritime and Qatar created a creditor-debtor relationship wherein Maritime provided the pharmaceuticals to individuals for Qatar, and Qatar paid for those pharmaceuticals. Qatar expected Maritime to provide those pharmaceuticals under the parties' arrangement and knew that Maritime expected payment for those pharmaceuticals.

27. Qatar's account remains open in an amount of at least $1.4 million in unpaid invoices for pharmaceuticals supplied by Maritime.

28. Maritime and Qatar pursued and entered into these transactions with the expectation of further dealing.

29. Maritime has suffered damages of at least $1.4 million as a result of Qatar's failure to pay its open account with Maritime.

## COUNT 3: Fraudulent Inducement

30. The preceding paragraphs are incorporated by reference for this claim.

31. Prior to entering into the agreement, Qatar made a series of representations to Maritime. Specifically, in 2012, Qatar, through Mairgani—a representative at the Consulate for the medical attaché, Al-Saadi—represented to Tesfaye, Maritime's President, that Qatar would pay for pharmaceuticals provided by Maritime to individuals receiving medical treatment in and

around Houston. Qatar, through Mairgani, also represented that the Embassy would pay for the pharmaceuticals once it received the Maritime invoices that had been signed by the representative for the medical attaché and/or his staff.

32. Qatar's representations were false. Beginning in 2018, the Embassy either underpaid or refused to pay for the pharmaceuticals supplied to individuals by Maritime.

33. Qatar knew the representations were false when it made them (because Qatar had no intention of paying the full amounts owed for the pharmaceuticals) or otherwise made the representations recklessly as a positive assertion and without knowledge or regard for their truth or falsity. Qatar also failed to disclose that it did not intend to make payments owed for the pharmaceuticals.

34. Qatar's misrepresentations and omissions were material to Maritime, and Maritime justifiably relied on those representations and omissions in supplying (and continuing to supply) pharmaceuticals to individuals on behalf of Qatar. That reliance was reasonable and substantial. Had Qatar not made the representations, Maritime would not have agreed to supply the pharmaceuticals.

35. Qatar made the misrepresentations with the intent that Maritime act and rely upon them, specifically, to supply pharmaceuticals, and Qatar knew or reasonably should have known that Maritime would rely on Qatar's misrepresentations and omissions.

36. Maritime acted and relied on Qatar's misrepresentations when it agreed to supply pharmaceuticals.

37. Maritime suffered injury because of Qatar's misrepresentations, including the cost of supplying the pharmaceuticals.

38. Maritime incurred damages of at least approximately $1.4 million as a result of Qatar's failure to pay for the pharmaceuticals supplied.

## COUNT 4: Fraud

39. The preceding paragraphs are incorporated by reference for this claim.

40. Qatar made a series of representations to Maritime. Specifically, in 2012, Qatar,

through Mairgani—a representative at the Consulate for the medical attaché, Al-Saadi—represented to Tesfaye, Maritime's President, that it would pay for pharmaceuticals provided by Maritime to individuals receiving medical treatment in and around Houston. Qatar, through Mairgani also represented that the Embassy would pay for the pharmaceuticals once it received the Maritime invoices that had been signed by the representative for the medical attaché and/or his staff.

41. Qatar's representations were false. Beginning in 2018, the Embassy either underpaid or refused to pay for the pharmaceuticals supplied to individuals by Maritime.

42. Qatar knew the representations were false when it made them (because Qatar had no intention of paying the full amounts owed for the pharmaceuticals) or otherwise made the representations recklessly as a positive assertion and without knowledge or regard for their truth or falsity. Qatar also failed to disclose that it did not intend to make payments owed for the pharmaceuticals.

43. Qatar's misrepresentations and omissions were material to Maritime, and Maritime justifiably relied on those representations and omissions in supplying (and continuing to supply) pharmaceuticals to individuals on behalf of Qatar. That reliance was reasonable and substantial. Had Qatar not made the representations, Maritime would not have supplied the pharmaceuticals.

44. Qatar made the misrepresentations with the intent that Maritime act and rely upon them, specifically, to supply pharmaceuticals, and Qatar knew or reasonably should have known that Maritime would rely on Qatar's misrepresentations and omissions.

45. Maritime acted and relied on Qatar's misrepresentations when it supplied pharmaceuticals.

46. Maritime suffered injury because of Qatar's misrepresentations, including the cost of supplying the pharmaceuticals.

47. Maritime incurred damages of at least approximately $1.4 million as a result of Qatar's failure to pay for the pharmaceuticals supplied.

### COUNT 5: Quantum Meruit (in the alternative)

48. The preceding paragraphs are incorporated by reference for this claim.

49. Maritime furnished valuable materials and services to individuals on behalf of Qatar by providing those individuals with pharmaceuticals.

50. Qatar requested that Maritime provide the pharmaceuticals to those individuals and knowingly accepted Maritime's providing the pharmaceuticals to the individuals.

51. Qatar was reasonably notified that Maritime expected compensation when it provided the valuable pharmaceuticals to individuals on behalf of Qatar.

52. Qatar benefited when Maritime provided the pharmaceuticals to those individuals on behalf of Qatar, but Maritime was not compensated for providing those pharmaceuticals. As a result, Qatar has been unjustly enriched.

53. Qatar was reasonably notified that Maritime expected compensation when it provided the valuable pharmaceuticals to individuals on behalf of Qatar.

### EXEMPLARY DAMAGES

54. The preceding paragraphs are incorporated by reference for this claim.

55. Qatar acted with fraud, malice and/or gross negligence with respect to its treatment of Maritime as described above, justifying an award of exemplary damages under Texas Civil Practice & Remedies Code § 41.003(a).

### CONDITIONS PRECEDENT

56. All conditions precedent to Maritime's right of recovery against Qatar have been performed, have occurred, or are excused or waived.

### ATTORNEYS' FEES

57. Maritime has incurred reasonable and necessary attorneys' fees in pursuit of its claims, and Maritime is entitled to recover attorneys' fees pursuant to Texas Civil Practice & Remedies Code § 38.001 *et seq*. Specifically, Maritime is entitled to recover attorneys' fees because its claims are for rendered services, furnished materials, and breach of contract. *See* TEX.

CIV. PRAC. & REM. CODE § 38.001(b).

58. Maritime has satisfied or will satisfy all conditions precedent and presentment requirements before trial.

### DEMAND FOR JURY TRIAL

59. Maritime demands a jury trial on all issues that may be tried to a jury.

### PRAYER

Maritime respectfully requests judgment in favor of Maritime on its claims, including an award of (i) actual damages; (ii) exemplary damages; (iii) attorneys' fees and costs; (iv) pre- and post-judgment interest; and (v) any other relief available in law or in equity to which Maritime may be entitled.

Respectfully submitted,

**CLEVELAND | KRIST PLLC**

*/s/ Gerard F. Bifulco*
Gerard F. Bifulco
State Bar No. 24130269
S.D. Tex. Bar No. 3771938
Austin H. Krist
Texas Bar No. 24106170
S.D. Tex. Bar No. 3735891
303 Camp Craft Road, Suite 325
Austin, Texas 78746
(737) 900-7103
gbifulco@clevelandkrist.com
akrist@clevelandkrist.com

*Attorneys for Maritime Pharmaceutical Services, Inc.*